NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

IN RE:
JAMES SPENCE KALOGEROS             Chapter 7

       Debtor                             Case No. 05-22001

---

MORANDE FORD, INC.            )        Adversary Proceeding
                              )
    Plaintiff                 )        No. 05-2080
                              )
v.                            )
                              )
JAMES SPENCE KALOGEROS        )
                              )
    Defendant                 )
                              )

---

APPEARANCES:

David E. Kamins, Esq.
Law Office of David E. Kamins, 32 Burnwood Drive, Bloomfield, CT 06002
Counsel for Plaintiff

Thomas J. Farrell, Esq.
Law Offices of Alan B. Silver, 274 Silas Deane Highway, Wethersfield, CT 06109
Counsel for Defendant - Debtor

---

### MEMORANDUM OF DECISION

KRECHEVSKY, U.S.B.J.

I.

The matter before the court is the adversary proceeding Morande Ford, Inc. ("MFI")[1] commenced, on September 19, 2005, against James Spence Kalogeros ("the

---

[1] The court, on May 11, 2006, dismissed the complaint as to two additional named plaintiffs for lack of standing, leaving only the First, Second, and Seventh Counts for trial.

debtor"), the debtor in a Chapter 7 bankruptcy case filed on June 14, 2005. MFI, the debtor's former employer, seeks to have its claims against the debtor held nondischargeable pursuant to Bankruptcy Code §523(a)(4) (debt from fiduciary defalcation) (First Count) and §523(a)(6) (debt from willful and malicious injury) (Second Count), and / or to deny the debtor a discharge pursuant to §727(a)(3) (failure to keep records) and §727(a)(5) (unexplained loss of assets) (Seventh Count). At a four-day trial which concluded on February 2, 2007, the court heard testimony from several witnesses and entered into evidence numerous exhibits. The parties subsequently filed memoranda of law in support of their positions.

II.

BACKGROUND FOR FIRST AND SECOND COUNTS

MFI, a new car dealership located in Berlin, Connecticut, hired the debtor as a salesman in 1992. In 1999, Robert Morande ("Morande"), president and chief executive officer of MFI, promoted the debtor to general manager, giving him the title Vice President and General Manager. MFI terminated the debtor in November 2004 for having an inappropriate relationship with a saleswoman. Following the debtor's termination, MFI conducted an investigation into the debtor's management of the dealership, which gave rise to the following claims of MFI against the debtor and to MFI's complaint for nondischargeability of such claims and for denial of a discharge to the debtor.

A. Claim Concerning Z

The debtor learned from a salesman that Salem Motors, a wholesale car dealer, had in its inventory a 1974 Cadillac automobile ("the Cadillac"). The debtor, who was

2

aware that his friend ("Z") was in the market for such a car, purchased the Cadillac for himself and Z, in January 2004. Because Salem Motors was a wholesaler and sold cars only to dealerships, the debtor arranged to purchase the Cadillac for $2,000 through MFI (with MFI acting as a conduit). The debtor reimbursed MFI the $2,000 and, because Z could add the Cadillac as an additional car to Z's existing auto insurance policy, the debtor titled the Cadillac only in Z's name. MFI's service department performed repairs and body work on the Cadillac. The debtor disputed a $600 repair bill to replace a window the debtor claimed was broken by an employee of the service department. That repair bill remains unpaid. Following his termination from MFI, the debtor sold his interest in the Cadillac to Z for $2,500. MFI asserts a nondischargeable claim for the unpaid repair work and for any profit the debtor received from Z.

### B.    Claim Concerning M

In order to take advantage of special pricing offered by Ford to families of its dealerships' employees, the debtor represented to Ford that his neighbor ("M"), who was purchasing a new car from MFI, was the debtor's brother-in-law. Ford became aware that M was not a relative of the debtor and subsequently charged back the discount to MFI. MFI seeks to recover the discount from the debtor.

### C.    Claim Concerning C

In June 2004, MFI's human resources administrator directed a recently-hired salesperson ("C") to leave work until she produced the second form of identification required by the Department of Homeland Security Form I-9. The debtor gave the employee permission to use a company car to return home to get the required

3

documentation. While en route, C was involved in an automobile accident and MFI's car was heavily damaged. The debtor testified that he discussed the accident with MFI's attorney, who was also the manager of its human resources department, and was told that the attorney would take care of filing the insurance claim. The insurance claim was not timely filed. MFI contends that it was the debtor's responsibility as general manager to ensure that the claim was properly filed; it seeks, in Count One, to recover for damages to the car.

### D. Claims Concerning Doane's

In addition to selling new vehicles, MFI also sold selected used vehicles it received as trade-ins from its new-car purchasers. Those trade-in vehicles that MFI did not wish to market at retail, it sold to used car dealerships on a wholesale basis. Both the debtor and Morande testified that MFI often sold its wholesale cars to used car dealers in lots and that frequently a late model or low mileage car in good condition would be included as an inducement in a lot with several "junk" cars that MFI wanted to get rid of. Sometimes such sales were conducted by auction and other times the selling price was negotiated. During 2003-04, MFI made several such wholesale sales, negotiated by the debtor, to certain used car dealerships, including Doane's Accent Auto ("Doane's"). MFI presented evidence that, on such sales, Doane's purchased vehicles from MFI for less than the values ("initial book values") MFI assigned to such vehicles when MFI acquired them. MFI seeks to recover from the debtor the excess of MFI's initial book values over the prices paid by Doane's. Morande testified that it was MFI's usual practice, at the end of each calendar year, to write down the book value for each of the used cars in its inventory, to reflect the car's then current value.

In January, 2004, the debtor, without advising MFI, started selling used cars part-time at Doane's on Friday afternoons and Sundays, his days off from MFI. Doane's compensated the debtor on a commission basis. At least some cars the debtor sold for Doane's were cars that Doane's had purchased from MFI. MFI contends that because the debtor was wholesaling cars on behalf of MFI to Doane's at the same time that he was benefitting from selling cars for Doane's, the debtor breached his fiduciary duty of loyalty to MFI, causing MFI to suffer a loss; and that such loss should be excepted from discharge under §523(a)(4). The debtor argues that Doane's was not a competitor of MFI; that although both dealerships sold used cars, MFI's were typically late model, low mileage cars in good condition, while Doane's were older, high mileage cars in a much lower price range.

### III.

### DISCUSSION

#### A.    Dischargeability of MFI's Claims

MFI seeks to have the above described claims against the debtor excepted from discharge pursuant to Bankruptcy Code §§523(a)(4) and (a)(6), which provide, in relevant part:

> § 523. Exceptions to discharge
>
> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt–
> ...
> (4) for fraud or defalcation while acting in a fiduciary capacity...
> ...
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ....

### First Count - §523(a)(4)

#### (a) Claim Concerning Doane's

The gist of MFI's allegations in the First Count is that the debtor, as vice-president and general manager of MFI, was a fiduciary; that, under Connecticut law, an officer of a corporation owes the corporation a duty of loyalty; that, as a result of the debtor's dealings with Doane's, MFI has a claim against the debtor for breach of such duty; and that MFI's claim should be held nondischargeable under §523(a)(4) as a debt for "defalcation while acting in a fiduciary capacity."

"Although the precise scope of the defalcation exception is a question of federal law, its application frequently turns upon obligations attendant to relationships governed by state law. For example, state law can be an important factor in determining whether someone acted in a fiduciary capacity under Section 523(a)(4)." The Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes), 183 F.3d 162, 166 (2d Cir. 1999). Under Connecticut law, the debtor, as an officer of MFI, had a duty of loyalty to MFI. See, e.g. Saginaw Products Corp. v. Cavallo, 1994 WL 443145 (Conn. Super. 1994) ("[O]fficers and directors are fiduciaries to the corporation.... The fiduciary duty comprises two prongs: a duty of care, and a duty of loyalty.") "[N]umerous cases have applied the defalcation exception to debts owed by corporate officers, notwithstanding the absence of any express trust." Hayes, 183 F.3d at 168. Accordingly, the court concludes that the debtor, in wholesaling cars to Doane's while employed by Doane's, had fiduciary obligations to MFI.

MFI claims it suffered a loss of $17, 966 from the wholesale sales, in 2003 and 2004, of used cars to Doane's, basing its calculation on the excess of MFI's initial book

6

values over the wholesale prices paid by Doane's for those vehicles. When questioned by the debtor's attorney, Morande testified that the way the debtor handled the wholesale sales was consistent with long-term company practices:

Q: Now, did you hear Mr. Kalogeros' testimony that the best way to move vehicles on a wholesale basis is to package the so-called junk with a good car to move things off the lot? Did you hear him testify to that effect?

A: Yeah. I heard him testify to that.

Q: Okay.

A: Yeah.

Q: And that's pretty much the way your company deals with wholesale.

A: Yeah. I've been doing that for 40 years.

(Transcript of 2/2/2007 at 38-39.)

The debtor admits that, in 2004, he sometimes sold cars for Doane's on his days off from MFI, but argues that MFI was not harmed by such activities because Doane's was not a competitor of MFI. The debtor testified that MFI did not keep in its used car inventory trade-ins with more than 70,000 miles, and that most of the cars wholesaled to Doane's had such high mileage. The debtor's testimony is supported by the documents ("deal jackets") admitted into evidence by MFI. Doane's produced the deal jackets for 67 vehicles it purchased from MFI. (Exh. 25.) The odometer disclosure statements provided to Doane's by MFI indicate that 48 such vehicles (72%) had mileage in excess of 100,000 miles and that 58 such vehicles (87%) had mileage in excess of 89,000 miles. The court concludes that, in selling primarily high mileage cars at the

lower-priced[2] end of the market, Doane's was not a competitor of MFI and that MFI was not harmed by the debtor's part-time employment by Doane's.

The debtor contends that MFI has not met its burden of proof on the essential elements of its nondischargeability claim under §523(a)(4) because it has not shown that "Mr. Kalogeros' sales practices with Doane's amounted to a defalcation or fraudulent conduct, as opposed to customary business practices in the used car wholesale business." (Debtor's Brief ¶21.) MFI, in its reply brief, argues that the debtor bears the burden of proving that his conduct was not aberrant; that "it is the defendant's obligation to prove that Mr. Kalogeros acted in a way that is considered the normal, usual, customary way and that he was not acting improperly...." (MFI Reply ¶7.)

Insofar as the determination of the validity of MFI's claim is concerned, state law applies and MFI bears the burden of proof that the debtor was a fiduciary and that MFI suffered a loss as to the matters entrusted to the debtor's care; the burden then shifts to the debtor to prove, by clear and convincing evidence, his fair dealing. See, e.g. Morris Street Assoc., I v. Welch (In re Welch), 211 B.R. 788, 795 (Bankr. D.Conn 1997). However, in a nondischargeability proceeding, the burden is on the creditor seeking an exception to discharge to prove, by a preponderance of the evidence, that its claim satisfies each of the elements of the applicable exception in §523(a). Grogan v. Garner, 498 U.S. 279, 286, 111 S. Ct. 654 (1991); In re Welch, 211 B.R. at 795. Further, "exceptions to dischargeability are narrowly construed, an approach that implements

---

[2] The cars that Doane's purchased from MFI were cleaned, repaired and sold for an average retail price of approximately $2,700 (Exh. 28).

8

the fresh start policy of the Bankruptcy Code." National Union Fire Insurance Co. of Pittsburgh, Pa. v. Bonnanzio (In re Bonnanzio), 91 F.3d 296, 300 (2d Cir.1996) (citations and quotation marks omitted).

MFI claims that the debtor's employment relationship with Doane's raises an inference that the debtor breached his duty of loyalty to MFI in his determination of the wholesale prices charged to Doane's for MFI vehicles and in his participation in writing down the book value of MFI's used car inventory. MFI alleges that the debtor wrote down the value of cars sold to Doane's so that it would appear that MFI was making a profit on such sales.

MFI has not shown that, prior to January 2004, there existed any relationship between the debtor and Doane's that would support an inference of impropriety on the part of the debtor concerning either his wholesaling of used cars to Doane's or his participation in the year-end write downs of MFI's used car inventories. MFI has shown that, from January 2004 until his termination from MFI on November 29, 2004, the debtor was in charge of wholesaling cars from MFI to Doane's and was selling cars at retail for Doane's. The court concludes that such facts, together with the debtor's concealing his relationship with Doane's from MFI, are sufficient to support an inference that the debtor was, during such time period, involved in self-dealing and defalcation. The debtor has provided no evidence to rebut such inference.

## VEHICLES SOLD TO DOANE'S IN 2004

| Deal No. | Year Sold | Initial Book Value (a) | 2003 Write Down (b) | Book Value on 1/1/2004 (a) - (b) (c) | Sales Price to Doane's (d) | Profit or Loss (d) - (c) (e) |
|---|---|---|---|---|---|---|
| 1 | 2003 | -- | -- | -- | -- | -- |
| 2 | 2003 | -- | -- | -- | -- | -- |
| 3 | 2003 | -- | -- | -- | -- | -- |
| 4 | 2003 | -- | -- | -- | -- | -- |
| 5 | 2003 | -- | -- | -- | -- | -- |
| 6 | 2004 | 15,660 | -- | 15,660 | 15,925 | 265 |
| 7 | 2004 | 1,300 | -- | 1,300 | 1,500 | 200 |
| 8 | 2004 | 12,695 | 155 | 12,540 | 10,500 | -2,040 |
| 9 | 2004 | 19,435 | -- | 19,435 | 19,300 | -135 |
| 10 | 2004 | 18,420 | 6,900 | 11,520 | 12,350 | 830 |
| 11 | 2003 | -- | -- | -- | -- | -- |
| 12 | 2003 | -- | -- | -- | -- | -- |
| 13 | 2004 | 9,610 | -- | 9,610 | 9,268 | -342 |
| 14 | 2003 | -- | -- | -- | -- | -- |
|  |  | $ 77,120 | $ 7,055 | $ 70,065 | $ 68,843 | $ -1,222 |

In accordance with the preceding calculations (based on Exh. 27), the court finds the portion of MFI's claim attributable to the debtor's conduct in 2004 to be $1,222. The court concludes that MFI has a nondischargeable claim against the debtor in the amount of $1,222, and that the balance of its claim concerning Doane's is not excepted from discharge under §523(a)(4).

### (b)    Other Claims

The debtor's purchase of the 1974 Cadillac for himself and Z did not violate the debtor's obligations to MFI. MFI argues that, if it had known that Z was looking for such a car, it would have looked for one, sold it to Z, and earned a profit. MFI sold primarily late-model, low mileage cars; an antique automobile like the Cadillac was outside the ambit of MFI's operations. Not only did the debtor not have any fiduciary

duty to alter the kinds of vehicles MFI would sell, MFI's evidence casts doubt on whether the debtor was even permitted to expand the scope of MFI's business along such lines. Morande testified, on direct examination by MFI's attorney:

Q: When it came to operating the dealership, did you give [the debtor] free rein to go any way he wanted to?

A: No. No. He - -

Q: What restriction did you put on him?

A: He had his restrictions and he had to follow the rules and regulations that we set down. We had just gone through the process of becoming blue oval certified by Ford Motor Company, and there was a whole set of guidelines, there were about three or four books about this think [sic] that I gave him to make sure that if you got [sic] any question about anything, it's all spelled out right in here.

Okay? I didn't give him free rein to do whatever he wanted. He was an employee of the company just like I was, just like everybody was.

(Transcript of 12/1/2006 at 166.)

The court concludes that MFI is not entitled to any profit the debtor may have made when, after his employment at MFI was terminated, he sold his interest in the Cadillac to Z. Insofar as MFI's claim for the unpaid $600 window repair to the Cadillac is concerned, it is simply a disputed repair bill, and is not excepted from discharge. It is not attributable to the debtor's performance or nonperformance of any fiduciary duty and is outside the scope of the §523(a)(4).

The court has considered all of the allegations of the complaint and concludes that the evidence produced by MFI is insufficient to support its other claims for debtor's defalcation while acting in a fiduciary capacity. The court further concludes that MFI, in failing to prove that it suffered any loss from the remaining allegations of the complaint (e.g., that the debtor spent too much on advertising; that certain

11

credits from Ford Motor Co. were applied on MFI's books to offset advertising expense; that some employees were paid more than necessary; that the debtor, and not MFI's attorney, was responsible for not filing an insurance claim) has failed to establish the validity of such claims. See News America Marketing In-Store, Inc. v. Marquis, 276 Conn. 310 (2005) (proof of a specific loss is an essential element of a claim for breach of a duty of loyalty to an employer).

### Second Count - §523(a)(6)

MFI seeks to have each of its claims against the debtor arising from the actions complained of, see supra Part II, held nondischargeable as a debt for willful and malicious injury. The court concludes that MFI has failed to carry its burden of proof. The United States Supreme Court held, in Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S. Ct. 974 (1998), that nondischargeability in accordance with §523(a)(6) requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."

The only evidence MFI proffered that the debtor might have harbored any ill will towards MFI was the testimony of Morande's brother-in-law ("D"), a salesman at MFI since 1984, regarding a casual conversation in a bar some six or seven years earlier. Not only is D's testimony insufficient to establish any malice on the part of the debtor towards MFI or Morande, but it provides no basis for an inference that the debtor undertook any of the actions at issue with the intent to injure MFI. Upon direct examination by MFI's attorney, D testified:

Q:    And can you relate an incident that occurred when you started having discussions with Mr. Kalogeros about some dissatisfaction he was having at Morande Ford?

| | |
|---|---|
| A: | Yeah. I shoot pool and there's a sports bar near the dealership and a bunch of us used to go from time to time down there and shoot pool. We had come down to this pub one night after work and Jimmy [the debtor] came in, which he did from time to time, and - - |
| Q: | When was this? |
| A: | This was in around - - it was in 2000 - - |
| The Court: | 2000? |
| A: | Yeah, about there, 2000.... A whole bunch of us used to come, salesmen, we used to go down there after hours. This particular evening Mr. Kalogeros had come in, and he would from time to time, he was a sales manager I believe at the time, and we got to talking about, you know, sales, because they were real good at that particular time. And Mr. Kalogeros made the comment to me that he was offered a job from ... Hoffman Ford in Hartford.<br><br>And I made the comment to him, I said, you know, well, geez, you know, it must be some pretty good money. and I kind of ventured into the area of what kind of money, salary they were offering. His comment to me was somewhat derogatory, that, you know, stating that, you know, he would consider it because he felt he wasn't getting properly compensated at Morande Ford. And he complained about, a little bit about Morande Ford and, you know, again I sympathized with him because I worked there as well, so sometimes it's tough.<br><br>And I made the reference that, you know, sometimes it's not easy, you know, working there. And he made the comment to me which I thought was kind of strange because of my status, about he was considering opening a used car lot up north, whether he meant Massachusetts or Connecticut, I'm not quite sure, and if I wasn't happy that he would offer me a job. I kindly declined at that point and went on with my business that evening. |
| Q: | Did he ever make any, at that time, derogatory comments about Mr. Robert Morande? |
| A: | Yeah, he made the comment that he felt Bob wasn't - - when I asked about the money part, he said that he felt that Bob wasn't treating him fairly per their agreement was the impression I got. Compensated properly I guess. |

(Transcript of 12/1/2006 at 141-43.)

   The court concludes that MFI's claims against the debtor are not excepted from

13

discharge under §523(a)(6).

### B. Denial of Discharge

In the Seventh Count of the complaint, MFI asks the court to deny the debtor a discharge pursuant to Bankruptcy Code §§727(a)(3) and (a)(5), which provide in relevant part:

> § 727. Discharge
>
> (a) The court shall grant the debtor a discharge, unless–
>
> ...
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
>
> ...
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities; ....

Courts generally have recognized the importance of the discharge to the debtor and, accordingly, have construed the provisions of § 727 liberally in favor of debtors. "Clearly, § 727 imposes an extreme penalty for wrongdoing. As such, [the Second Circuit Court of Appeals has] held that it must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." In re Chalasani, 92 F.3d 1300, 1310 (2d Cir. 1996) (citation and quotation marks omitted).

The plaintiff has the burden of proof in an adversary proceeding objecting to discharge. Fed. R. Bankr. P. 4005. The standard of proof is the preponderance of the evidence. Wolfson v. Wolfson (In re Wolfson), 152 B.R. 830, 832 (S.D.N.Y. 1993). "Once sufficient evidence is presented by the plaintiff to satisfy the burden of going forward with the evidence, the burden thereafter shifts to the debtor to provide

14

evidence to rebut the plaintiff's prima facie case. The plaintiff, however, always bears the ultimate burden of proving, by a preponderance of the evidence, the essential elements of an alleged objection to discharge." PaineWebber, Inc. v. Gollomp (In re Gollomp), 198 B.R. 433, 440 (S.D.N.Y. 1996).

MFI contends that the debtor, at one time, had owned bars, condominiums, and stocks and that he has failed to account for or provide records for their loss. The debtor denies that he ever owned any such assets, but acknowledges that he had a tendency to brag and pretend to be wealthier than he actually was. In support of its contentions, MFI relies upon D's testimony:

Q:    Did [the debtor] ever have a discussion that you recall about ownership of property, any kind of property, real estate (inaudible)?

A:    He told me that he owned condominiums and that he had some joint ventures in properties he mentioned to me, but I mean, you know, just in conversation.

(Transcript of 12/1/2006 at 143-44.)

Morande testified, in response to direct examination by MFI's attorney, that, in 2001, the debtor had consulted him while the debtor was preparing a financial statement for submission to Ford Motor Company:

Q:    What did Mr. Kalogeros tell you in 2001 concerning his assets?

A:    He told me that he owned real estate, a rental condo, he had money in the bank, he had stocks and bonds, and he had a sufficient amount to satisfy Ford Motor Company....

Q:    Do you recall approximately the total amount he said he had in assets in 2001?

A:    He was close to about $300,000 plus some cash, with everything, the real estate, stocks and bonds, and the cash.

(Transcript of 2/2/2007 at 14-15.)

15

The debtor, also in response to direct examination by MFI's attorney testified:

Q:  Did you - - and I asked you [earlier in the trial] if you had ever owned property in the past and you - -

A:  Correct. No. I did not ever own any property.

Q:  All right. Now, Mr. Kalogeros, do you remember in 2001, in December 2001, that you submitted a financial statement to Ford Motor Company?

A:  It wasn't a - - I don't remember exactly what it was called.

Q:  Did you submit something with a statement of your financial assets to Ford Motor Company?

A:  My assets? No. As I had understood it, put down what you and your wife had, as, you know, as assets. It was my wife and I combined. Correct. That's what I put down, my wife and I combined.... I just put down what I was told to do. My wife owned a house, and she owned a condo in her name. Not owned it, but mortgages on them. Correct.
...

Q:  You did sign the application?

A:  Yup. But - - that's what Mr. Morande described - - told me. Put what your wife and you have. And that's what I put....

(Transcript of 2/2/2007 at 51-56.)

The court concludes that MFI has not met its burden of proof that the debtor ever owned the substantial assets as alleged. Accordingly, it will not deny the debtor a discharge for his failure to explain the loss of or provide records of such nonexistent assets.

IV.

CONCLUSION

In accordance with the foregoing discussion, the court concludes that MFI has a nondischargeable claim against the debtor to the extent of $1,222, and that the balance of its claims are dischargeable. MFI's objection to the debtor's discharge is

denied. Judgment shall so enter.

Dated at Hartford, Connecticut this 20th day of June, 2007.

                                          ROBERT L. KRECHEVSKY
                                          UNITED STATES BANKRUPTCY JUDGE